IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Cr. No. 19-MJ-4330 |
| | ) | Cr. No. 19-CR-50051 |
| vs. | ) | |
| | ) | |
| NATHAN ANDREW CASTILLO, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

This matter comes before the Court on the United States' Motion to Compel Testing for Tuberculosis (Doc. 12), filed on December 18, 2019. Defendant Nathan Andrew Castillo opposes the government's motion. *See* Docs. 19, 20, 21. The Court held a hearing on the motion on January 9, 2020. Doc. 23. For the following reasons and for the reasons stated at the hearing, the Court GRANTS the United States' motion as follows.

I.     Background

On December 3, 2019, Defendant Nathan Andrew Castillo came before the Court after having been arrested on an arrest warrant and indictment issued out of the United States District Court for the District of South Dakota. *See* Docs. 1–3. After an identity hearing and a detention hearing at which Mr. Castillo was represented, [1] U.S. Magistrate Judge Kirtan Khalsa found that Mr. Castillo was the person named in the indictment from South Dakota, and she ordered that

---

[1] The Court notes that Mr. Castillo objected to his lawyer representing him and objected to the Court's jurisdiction and authority over him. The Court explained to him that he could raise his desire to represent himself when he appears in the District of South Dakota. The Court reviewed the documents that Mr. Castillo filed. Docs. 19, 20. Document 19 is incoherent, and the Court could not follow it, but it did not appear to be relevant to any issues before the Court. Document 20 also did not appear to be relevant to the issues before the Court, and none of the statements and objections Mr. Castillo made during the hearing were relevant to the issues before the Court.

Mr. Castillo be detained and sent to the District of South Dakota for further proceedings. *See* Docs. 6, 8–10. Pursuant to standards set by the Centers for Disease Control and Prevention (CDC), the American Correctional Association (ACA), the National Commission on Correctional Health Care (NCCHC) and "good medical practices established by the professional medical community," the U.S. Marshals Service (USMS) requires that all prisoners be screened for TB before they can be transported by the Justice Prisoner and Alien Transportation System (JPATS) and within 14 calendar days of arrival at a USMS intake facility. *See* Doc. 18 at 2–4; Doc. 18-1 at 1–5. On or about December 13, 2019, Mr. Castillo refused to undergo testing for TB because "he doesn't want to be sent to another state." Doc. 16-1. As a result, the United States filed its motion requesting that the Court order Mr. Castillo to submit to the required TB testing and treatment, if necessary. *See* Doc. 12.

II. Discussion

In *Turner v. Safley*, 482 U.S. 78, 89 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Although *Turner* dealt with restrictions on inmate marriages and correspondence between inmates, its standard "applies to *all* circumstances in which the needs of prison administration implicate constitutional rights," *Washington v. Harper*, 494 U.S. 210, 224 (1990) (emphasis added), even if the right infringed upon is a fundamental one, *id*. at 223 (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).[2] The *Turner* reasonableness standard thus applies to claims involving involuntary medical treatment, *see Harper*, 494 U.S. at 223–24, and, by extension, involuntary medical testing.

---

[2] Defense counsel suggested that Mr. Castillo may have a religious objection to the TB testing, Doc. 21 at 6, but as discussed at the hearing, the Court found no evidence that this was true. Even if it were true, it would not change the analysis.

The three *Turner* factors that bear on the reasonableness of a prison regulation relating to involuntary medical treatment are: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)); (2) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," *id*. at 90; and (3) whether there is a ready alternative to the policy "that fully accommodates the prisoner's rights at de minimis cost to valid penological interests," *id*. at 90–91. *See Harper*, 494 U.S. at 224–25. Importantly, the third factor does not require that prison officials "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id*. at 225 (quoting *Turner*, 482 U.S. at 90–91). Applying these three factors to the USMS regulations that require TB testing, I conclude that those regulations comport with constitutional requirements.

According to information available on the CDC's website, approximately 4 to 6% of TB cases reported in the United States each year occur among people incarcerated at the time of diagnosis. The incarcerated population contains a high proportion of people at greater risk for TB than the overall population. From 1993 to 2017, there were a total of 13,770 TB cases reported among persons in correctional facilities at the time of their diagnosis. TB bacteria are spread through the air from one person to another. TB bacteria are put into the air when a person with TB disease of the lungs or throat coughs, speaks, or sings. People nearby may breathe in these bacteria and become infected. If not treated properly, TB can be fatal.

Because incarcerated persons are at higher risk for being infected with TB bacteria, the CDC recommends that they be tested for TB. TB testing usually begins with a Tuberculin Skin Test (TST), which involves injecting a small amount of fluid (called tuberculin) into the skin on

the lower part of the arm. A positive skin test means that the person's body was infected with TB bacteria, and additional tests are necessary to determine if the person has latent TB infection or TB disease. The USMS requires that any prisoner with a positive TST test receive a chest x-ray to make sure that the prisoner does not have active TB disease before the prisoner can be transported. *See* Doc. 18 at 3. If a chest x-ray is positive for TB disease, the prisoner must be treated before he or she can be transported. *See id.* at 3–4.

As the Tenth Circuit has noted with respect to the involuntary treatment of TB, a "prison's interest in responding to the threat of . . . any contagious disease occurring in prison[] is obviously strong." *Cummings v. Ellsworth Correctional Facility*, 511 F. App'x 808, 812 (10th Cir. 2013) (unpublished) (quoting *Dunn v. White*, 880 F.2d 1188, 1195 (10th Cir. 1989)). The USMS's interest in reducing the risk of TB infection is equally strong, and therefore TB screening of all prisoners before they are transported—all of whom are at high risk of TB infection—is reasonably related to a legitimate penological interest. The USMS is responsible for protecting all individuals within its custody as well as its own employees and other persons who regularly come into contact with individuals in USMS custody. The screening process is done by healthcare professionals in accordance with the latest CDC standards, and is relatively non-invasive. Doc. 18-1 at 6–7. There is no question that there is a logical connection between the USMS policy requiring TB testing and the USMS's interest in reducing the risk of TB disease among persons in USMS custody.

Permitting Mr. Castillo and other prisoners to refuse TB testing and treatment would place the health of other prisoners and USMS personnel at risk and would subject the USMS to liability for failing to protect others from a potentially fatal disease. Alternatives to TB testing, such as requiring Mr. Castillo to wear a face mask, is not a practical alternative as he cannot eat

and drink with a face mask on, and he can easily remove the face mask unless his hands are always restrained. Isolating Mr. Castillo from other prisoners would put a significant burden on the USMS; TB is an airborne disease, and isolating individuals who simply chose not to be tested, as opposed to those who test positive for active TB, is simply not practical. At the very least, he cannot be placed in isolation while he is being transported from New Mexico to South Dakota. The USMS requirement that Mr. Castillo be tested for TB before he is transported to South Dakota does not violate the Constitution.

III. Conclusion

For the foregoing reasons, and for the reasons stated on the record at the hearing, the Court orders that defendant Nathan Andrew Castillo submit to TB testing, including a TST test and/or chest x-ray at the expense of the USMS, as well as submit to any other appropriate medical tests for TB infection and/or treatment for TB that are determined to be required by healthcare professionals in accordance with USMS policies. To the extent that Mr. Castillo physically refuses to submit to the TB testing and/or treatment, the USMS shall take reasonable steps, including the physical restraint of Mr. Castillo, as may be necessary to administer the necessary TB tests and/or treatment.

**IT IS SO ORDERED.**

Laura Fashing
U.S. Magistrate Judge